# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE LAMICTAL DIRECT PURCHASER ANTITRUST LITIGATION | :<br>:<br>:<br>:    **OPINION** |
| THIS DOCUMENT RELATES TO:<br>ALL DIRECT PURCHASER ACTIONS | :<br>:    No. 12-cv-995 (WHW)<br>:<br>: |

**Walls, Senior District Judge**

This Court dismissed the complaint of Direct Purchaser Plaintiffs Louisiana Wholesale Drug Company, Inc. and King Drug Company of Florence, Inc. for failure to state a claim upon which relief could be granted. Plaintiffs appealed, and the Third Circuit remanded the case to this Court in light of the Supreme Court's decision in *FTC v. Actavis*, 133 S. Ct. 2223 (June 17, 2013). The Court affirms its order of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

GlaxoSmithKline LLC ("GSK") sells Lamictal Tablets and Lamictal Chewables, which treat epilepsy and bipolar disorder. Am. Compl. ¶ 46 (ECF No. 55). These products are very profitable. As example, from March 2007 to March 2008, GSK's domestic sales of Lamictal Tablets exceeded $2 billion. *Id.* The lower-dosage Lamictal Chewable products had domestic sales of about $50 million from 2004 to 2005. *Id.* The active ingredient in Lamictal products is lamotrigine, covered by U.S. Patent No. 4,602,017 ("the '017 patent"). *Id.* ¶ 11. GSK's patent for lamotrigine expired in July 2008. *Id.*

In 2002, Defendants Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals ("Teva") sought to produce generic versions of lamotrigine and filed Abbreviated New Drug

Applications ("ANDAs") with the Food and Drug Administration ("FDA"). *Id.* ¶ 50. As the first generic manufacturer to file an ANDA for lamotrigine, Teva would be entitled to a 180-day period during which it would be the only generic manufacturer authorized to market the drug (the "first-filer exclusivity period"). *Id.* ¶ 12. In response to Teva's ANDA, GSK sued Teva for patent infringement. *Id.* ¶ 54. On January 27, 2005, Judge Bissell ruled from the bench that claim 1 of the '017 patent was invalid as anticipated by prior art. *Id.* ¶ 56. On February 2, 2005, the parties had a conference before Judge Bissell to announce that they were in settlement negotiations and asked the court to refrain from any further rulings. *Id.* ¶¶ 68-69. There are three key terms of the resulting settlement, which the Court paraphrases:

1) **Chewables**: Teva was permitted to sell generic lamotrigine chewables by June 1, 2005. *Id.* ¶ 70. This "early entry" period was approximately 37 months before the expiration of the '017 patent, and also before the FDA approved Teva's ANDA for lamotrigine chewables. *Id.* GSK supplied the chewables to Teva and Teva began selling them on May 25, 2005. *Id.*

2) **Tablets**: Teva was permitted to sell generic lamotrigine tablets during an "early entry" period of about six months before the expiration date of the '017 patent. *Id.* ¶ 71; GSK Mot. Dis., Ex. A ("License and Supply Agreement" ("Settlement")) at 11-12 (ECF No. 72-2). At the time, GSK did not know if it would receive "pediatric exclusivity" from the FDA which, if awarded, adds an additional six months of protection to the existing patent term. If GSK did not receive pediatric exclusivity, Teva would have been allowed to enter the tablet market on March 1, 2008. Settlement at 12. If GSK did receive pediatric

exclusivity, Teva would have been allowed to enter July 21, 2008—the date
the '017 patent was originally due to expire—via an exclusive waiver from the
pediatric exclusivity extension. *Id.* ¶ 71; Settlement §§ 2.2(b) (regarding
chewables), 2.3(b) (regarding tablets). In 2007, GSK received pediatric
exclusivity and thus an extra six months of patent protection, so the latter date
applied. *Id.* ¶ 49.

3) **The "No-AG Agreement"**: GSK agreed not to launch its own generic
versions of Lamictal products (or "authorized generics," the common name
for products manufactured by the brand name manufacturer but without the
brand name) during Teva's first-filer exclusivity period—i.e., the 180 days
after Teva first marketed the generic version of the drug. Am. Compl. ¶¶ 76,
81. Because GSK received pediatric exclusivity, extending its patent
protection from July 2008 to January 2009, Teva enjoyed its first-filer
exclusivity period at the same time. This agreement arises from the exclusive
license provisions, which specifically made the license exclusive "including as
to GSK and its Affiliates and Third Parties with respect to Generic
Equivalents." Settlement §§ 2.2(a), 2.2(b) (regarding chewables), 2.3(a),
2.3(b) (regarding tablets); Pls.' Opp'n Br. at 21-22, 22 n.17 (ECF No. 86).

In sum, in exchange for dropping its challenge to GSK's patents, the settlement allowed Teva to
market generic lamotrigine before the relevant patent expired and ensured that once it did so, its
generic tablets and chewables would not face competition from GSK's own "authorized generic"
for a certain period of time. *Id.* ¶¶ 76, 81, 86.

Plaintiffs allege that the settlement violates federal antitrust laws. *Id.* ¶¶ 108-50. Defendants filed a motion to dismiss the complaint on August 15, 2012, ECF Nos. 72-73, which this Court granted. Op. of Dismissal (ECF No. 105), *In re: Lamictal*, No. 12-cv-995 (WHW), 2012 WL 6725580 (Dec. 6, 2012).

At the time, the circuits were split about when and under what standard district courts should scrutinize "reverse payment settlements" between a brand name and generic drug manufacturer under the Drug Price Competition and Patent Term Restoration Act of 1984, 98 Stat. 1585, as amended, commonly known as the Hatch-Waxman Act. In 2012, the Third Circuit announced that the appropriate test was a "quick look": if a patent holder makes a reverse payment to a generic patent challenger, that payment is "*prima facie* evidence of an unreasonable restraint of trade." *Id.* at *4, citing *In re K-Dur Antitrust Litig.*, 686 F.3d 197, 218 (3d Cir. 2012). Other circuits, including the Federal Circuit, applied the "scope of the patent" test, according to which reverse payment settlements are immune from antitrust scrutiny as long as the settlement falls within the scope of the patent. *Id.* at *5. Under "quick look," most reverse payment settlements get antitrust scrutiny, and under "scope of the patent" most do not. *See Actavis*, 133 S. Ct. at 2230  (describing the "quick look" standard as "settlements presumptively unlawful" and the "scope of the patent" standard as "settlements generally immune from antitrust attack").

Applying *K-Dur* (the standard more lenient to plaintiffs), this Court found that its decision rested on a preliminary question: whether the settlement at issue contained a "reverse payment." Defendants argued that it did not because there was no transfer of money; Plaintiffs argued that it did because Teva had received "significant consideration, incentives, and benefits." *Lamictal*, 2012 WL 6725580, at *6. The Court sided with Defendants, finding that because the

4

settlement did not involve a transfer of money, it "[was] not subject to antitrust scrutiny": "The Third Circuit's *K-Dur* opinion is directed towards settlements when a generic manufacturer is paid off with money, which is not the case here." *Id.* The Court concluded that Plaintiffs had failed to state a claim for which relief could be granted. *Id.* at 7.

Plaintiffs appealed. ECF No. 107. On February 26, 2013, the Third Circuit stayed proceedings pending the Supreme Court's decision in *FTC v. Actavis*.[1] Third Circuit Do. No. 12-4584, Doc. No. 003111176912. The Supreme Court issued its opinion on June 17, 2013. 133 S. Ct. 2223. Two days later, the Third Circuit lifted the stay and Defendant-Appellees promptly moved to remand the case to this Court in light of *Actavis*. Defs.-Appellees' Mot. for Remand, Third Circuit Do. No. 12-4584, Doc. No. 003111300341. Plaintiff-Appellants opposed the move to remand, arguing that even if *Actavis* changed the antitrust standard for review, this Court's opinion granting Defendants' motion to dismiss was based not on the antitrust standard but on the insufficiency of Plaintiffs' pleadings. Pls.-Appellants' Opp'n to Mot. for Remand at 6, Do. No. 12-4584, Doc. No. 003111305434. On July 2, 2013, the Third Circuit remanded the case to this Court ". . . for further proceedings." Do. No. 12-4584, Doc. No. 003111312528.

On July 26, 2013, Plaintiffs filed a motion for reconsideration of the opinion and order granting Defendants' motion to dismiss. ECF No. 113. After Defendants opposed the motion and Plaintiffs replied, ECF Nos. 119-20, 122, there followed a flurry of letters regarding additional authority Plaintiffs wanted the Court to consider: an amicus brief the Federal Trade Commission ("FTC") filed in *In re Effexor Antitrust Litigation*, Do. No. 11-cv-5479, a case in this district

---

[1] Then known as *FTC v. Watson Pharmaceuticals, Inc.*

before Judge Sheridan, ECF No. 117; an opinion from a different case before Judge Sheridan, *In Re: Lipitor Antitrust Litigation*, No. 3:12-cv-2389 (PGS), 2013 WL 4780496 (D.N.J. Sept. 5, 2013), ECF No. 123; and an opinion from the District of Massachusetts, *In Re: Nexium (Esomeprazole) Antitrust Litigation*, No. 12-md-02409 (WGY), 2013 WL 4832176 (D. Mass. Sept. 11, 2013), ECF No. 125. Defendants asked this Court to ignore these submissions or, in the alternative, find them unpersuasive. ECF Nos. 121, 127.

## STANDARD OF REVIEW

### I.   Reconsideration

"The first question to be decided is the nature of the reconsideration which the Third Circuit mandated." *Rolo v. City Investing Co. Liquidating Trust*, 897 F. Supp. 826, 830 (D.N.J. 1995) *aff'd*, 155 F.3d 644 (3d Cir. 1998). In *Rolo*, the Third Circuit vacated a dismissal Judge Debevoise had ordered and remanded for reconsideration in light of intervening Third Circuit authority. Judge Debevoise ultimately concluded that, "even if [the intervening authority] had been decided in December 1993 and applied in this case, the plaintiffs' [] claims would have been dismissed . . . ." *Id.* at 833. The Third Circuit affirmed. 155 F.3d 644. *See also In re Mazzocone*, 183 B.R. 402, 409 (Bankr. E.D. Pa. 1995) *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (explaining that, on remand generally, "a trial court should attempt to put the parties back to the place where the error identified on appeal occurred").

When a party moves for reconsideration under Federal Rule of Civil Procedure 59(e), the scope will be determined by the basis for the motion, such as a claim that reconsideration is "justified by an intervening change in controlling law." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2810.1 at 158-62 (3d ed. April

2013) (listing four possible rationales); *see North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995). But, "[t]he Rule 59(e) motion may not be used to relitigate old matters . . . ." 11 Wright & Miller § 2810.1 at 163-64. *See Gutierrez v. Ashcroft*, 289 F. Supp. 2d 555, 561 (D.N.J. 2003) ("A party seeking reconsideration must show more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." (citation and quotation omitted)).

Here, it is obvious that the Court's task is to reconsider, in light of *Actavis*, its December 2012 opinion and order dismissing the case. Plaintiffs have submitted what they call a motion for reconsideration,[2] though their brief veers widely from the Court's narrow mandate. The Plaintiffs spend most of their brief "relitigating old matters" in a manner that would be patently inappropriate under Rule 59(e); had Plaintiffs submitted their motion absent a mandate from the Third Circuit to consider *Actavis*, the Court would summarily have denied it for failure to "show more than a disagreement with the Court's decision." Indeed, as even they concede, "Plaintiffs believe this Court's position would not be altered by *Actavis*." *See* Pls.' Recon. Reply at 4 (ECF 122). Simply, what follows is this Court's reconsideration of Defendant's motion to dismiss in the presence of *Actavis*'s authority.

---

[2] The full name is "Direct Purchaser Plaintiffs' Opening Brief in Support of Motion to Reconsider Dismissal of Action for Failure to State an Antitrust Cause of Action in Light of Recent Supreme Court Precedent." ECF No. 113-1.

## II.   *Actavis*

What did the Supreme Court do in *Actavis*? The opinion clearly did at least one thing. In deciding the appropriate level of antitrust scrutiny for reverse payments, the Supreme Court explicitly rejected both current circuit tests: "scope of the patent," 133 S. Ct. at 2231 (describing its holding as "contrary to the [Eleventh] Circuit's view that the only pertinent question is whether 'the settlement agreement . . . fall[s] within' the legitimate 'scope' of the patent's 'exclusionary potential'") and "quick look," *id.* at 2237 (explaining that this approach is only appropriate when the "anticompetitive effect on customers and markets" is clear to "an observer with even a rudimentary understanding of economics"). Instead, it adopted the "rule of reason" analysis generally applied in antitrust matters. *Id.* The Court summarized its holding:

> In sum, a reverse payment, where large and unjustified, can bring with it the risk of significant anticompetitive effects; one who makes such a payment may be unable to explain and to justify it; such a firm or individual may well possess market power derived from the patent; a court, by examining the size of the payment, may well be able to assess its likely anticompetitive effects along with its potential justifications without litigating the validity of the patent; and parties may well find ways to settle patent disputes without the use of reverse payments.

133 S. Ct. at 2237. To this Court, that looks like a three-part test: two steps to determine *when* to apply this rule of reason, followed by an application of the rule of reason to the scenario. In Step One, a district court must ask, is there a reverse payment? As the Court discusses below, the answer hinges on what the parties exchanged in the settlement and must include money. In Step Two, a district court must ask, is that reverse payment large and unjustified? As the Supreme Court explained, only *certain* reverse payments will actually warrant scrutiny. *See, e.g.*, *Actavis*, 133 S. Ct. at 2237 (explaining that "the likelihood of a reverse payment bringing about

8

anticompetitive effects" is not presumed but "depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification").

Step Three is the rule of reason. Under that analysis, long a standard tool of antitrust law, a court asks whether the parties to an agreement creating a restraint of trade had market power and exercised it, whether the restraint had anti-competitive consequences and whether those consequences are otherwise justified. *See United States v. Brown Univ.*, 5 F.3d 658, 679 (3d Cir. 1993) (describing the three steps of traditional rule of reason analysis). The *Actavis* opinion lays out "five considerations" to guide district courts in applying the rule of reason in this context. *See* 133 S. Ct. at 2234-37. Put as questions, those considerations are: First, Does the payment have the "potential for genuine adverse effects on competition"? *Id.* at 2234. Second, Is the payment justified in some way, perhaps because it approximates "litigation expenses saved through the settlement" or compensates the patent challenger for "other services . . . such as distributing the patented item or helping to develop a market for that item"? *Id.* at 2235-36. Third, Does the brand name manufacturer have the market power needed to bring about anticompetitive harm? *Id.* at 2236. Fourth, Does the size of the settlement suggest that it is intended to maintain supracompetitive prices and serve as a "workable surrogate for a patent's weakness"? *Id.* at 2236-37. Fifth, Could the parties have settled in some way that did not involve the use of reverse payments? *Id.* at 2237. Under this fifth consideration, the Court explicitly created a carve out for early entry provisions:

> [T]he fact that a large, unjustified reverse payment risks antitrust liability does not prevent litigating parties from settling their lawsuit. They may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the

> patentee's market prior to the patent's expiration, without the
> patentee paying the challenger to stay out prior to that point.

*Id.* These five considerations track onto traditional rule of reason analysis fairly cleanly: District courts must ask whether the parties to a settlement had market power, a factor which appears here as the third consideration, whether the trade restraint at issue had anti-competitive consequences, the first and fourth considerations, and whether those consequences are justified, the second and fifth considerations.

There is some overlap in the steps as this Court describes them. As example, the Supreme Court's concern about a settlement's size appears both in Step Two and in Step Three. This could suggest to some that Steps One and Two are not preliminary steps, but rather part of a broad, open-ended balancing of the "five considerations" in Step Three. As discussed further, this Court does not so conclude. *Actavis* is clear that only certain reverse payment settlements will trigger antitrust scrutiny; the framework established here provides a direct way for district courts to make that inquiry in the manner *Actavis* demands.

## DISCUSSION

The settlement allowed Teva to enter the market for lamotrigine chewables 37 months early and the market for lamotrigine tablets 6 months early. Am. Compl. ¶¶ 70-71. GSK agreed not to produce an authorized generic lamotrigine, in either chewable or tablet form, during Teva's first-filer exclusivity period from July 2008 to January 2009. *Id.* at 76. Teva, in return, dropped its challenge to the Lamictal patents. Plaintiffs alleged that this settlement violated federal antitrust laws. This Court found that, under *K-Dur*, the settlement did not trigger antitrust scrutiny because there was no transfer of money and therefore the amended complaint failed to state a claim.

10

The only question before the Court is whether *Actavis* and its adoption of a "rule of reason" standard for antitrust scrutiny of reverse payment settlements renders Plaintiffs' amended complaint sufficient. This would be the case if one of two things were true: if *Actavis* does not require a preliminary finding of a "reverse payment," but instead requires scrutiny of every patent settlement for anticompetitive concerns, or if *Actavis* defines "payment" in a way that includes non-monetary transfers of value.

Neither of these readings of *Actavis* is supportable. It follows that *Actavis* does not change the outcome of Defendants' motion to dismiss and the earlier opinion stands. The Court has also considered how the settlement would fare under the rule of reason analysis if a reverse payment of money was absent and finds that the settlement would most likely survive.

## I.  *Actavis* Scrutiny Applies Only to Patent Settlements that Contain Reverse Payments

The Court has considered the possibility that *Actavis* requires district courts to apply the rule of reason not only to reverse payment settlements but to *all* patent settlements with any anticompetitive potential. *See* FTC Amicus, *In re: Effexor XR Antitrust Litigation*, No. 3:11-cv-05479, ECF No. 236-2 (No. 12-cv-995 (WHW) ECF No. 117) at 9 ("The Supreme Court's rejection of the scope-of-the-patent test and its directive to consider traditional antitrust factors is not a special rule limited to 'reverse payment' cases.").[3] But *Actavis* just does not go that far.

*Actavis* certainly looks more skeptically at patent settlements than did courts applying the "scope of the patent" test and there is some very broad language in the opinion regarding patent

---

[3] The Court has decided, in its discretion, to consider this submission.

settlements of all kinds. *See, e.g.*, 133 S. Ct. at 2232 ("[T]his Court's precedents make clear that patent-related settlement agreements can sometimes violate the antitrust laws."); *id.* at 2238 (describing the "basic question" as "that of the presence of significant unjustified anticompetitive consequences"); *id.* at 2233 (describing how earlier cases in this area of law "seek to accommodate patent and antitrust policies, finding *challenged terms and conditions* unlawful unless patent law policy offsets the antitrust law policy strongly favoring competition" (emphasis added)). It is possible to read the Court's statement about "challenged terms and conditions" to mean that any term or condition of a patent settlement can trigger antitrust scrutiny, without regard to whether the settlement contains a reverse payment.

But that argument does not persuade. *Actavis* requires scrutiny only of patent settlements that contain reverse payments. The Court's focus is on reverse payments from the very first words of the opinion. *See* Section II, below. It explains that there is "something quite different" about reverse payment settlements, as opposed to "traditional" and "commonplace forms" of settlement, which is why only the former are subject to antitrust scrutiny. *Id.* at 2233. Other types of settlement are explicitly exempt: though "a large, unjustified reverse payment risks antitrust liability," the Court provides that parties may "settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration" without also paying the generic. 133 S. Ct. at 2237. At the very least, then, one kind of settlement may be free from antitrust scrutiny: one consisting *solely* of an early entry provision.[4]

---

[4] Plaintiffs and the FTC would likely argue that this carve out extends only that far and no further. *See* FTC, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact (2011) ("2011 FTC Report"), 140, http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

Finding that a settlement contains a reverse payment is a necessary prerequisite to undertaking the broader *Actavis* rule of reason analysis. Any language suggesting otherwise is too vague and too far removed from the Supreme Court's holding to be anything other than dicta.

## II.   *Actavis* Applies Only to "Reverse Payments" of Money

Whether a "reverse payment" is required is one question and how to define that term is another.

Plaintiffs argue that the settlement amounted to a "reverse payment" because it "conferred substantial financial benefits on Teva"—namely, through the No-AG Agreement. Pls.' Mot. Recon. at 1 (ECF No. 113-1). But nothing in *Actavis* says that a settlement contains a reverse payment when it confers substantial financial benefits or that a no-AG agreement is a "payment."

Both the majority and the dissenting opinions reek with discussion of payment of money. Writing for the majority, Justice Breyer immediately begins his opinion by saying:

> Company A sues Company B for patent infringement. The two companies settle under terms that require (1) Company B, the claimed infringer, not to produce the patented product until the patent's term expires, and (2) Company A, the patentee, to *pay B many millions of dollars*. *Because the settlement requires the patentee to pay the alleged infringer, rather than the other way around, this kind of settlement agreement is often called a 'reverse payment' settlement agreement*.

―――――――――――――

("These types of simple settlements, with no other provisions, generally do not raise competition concerns."). But such a reading would far too greatly constrict parties' power to settle, a power the *Actavis* court clearly meant to keep intact.

13

133 S. Ct. at 2227 (emphasis this Court's). This is the factual foundation of the resulting opinion and decision. Later on, the Justice repeats: "In reverse payment settlements . . . a party with no claim for damages . . . walks away with money simply so it will stay away from the patentee's market." *Id.* at 2233.

The referenced language reasonably means that the Supreme Court considered a reverse payment to involve an exchange of money. *See also id.* at 2231 ("The FTC alleges that in substance, the plaintiff agreed to pay the defendants many millions of dollars . . . there is reason for concern that settlements *taking this form* tend to have significant adverse effects on competition" (emphasis added)); *id.* at 2233 (plaintiff "pays money" to defendant); *id.* at 2234 ("multimillion dollar payoffs"); *id.* at 2235 ("patentees sometimes pay a generic challenger a sum even larger than what the generic would gain in profits").

Granted, there is an argument that a "reverse payment" need not consist of money. Black's Law Dictionary defines "payment" as the "[p]erformance of an obligation by the delivery of money *or some other valuable thing* accepted in partial or full discharge of an obligation." Black's Law Dictionary (9th ed. 2010) (emphasis added). *See* 60 Am. Jur. 2d Payment § 30 ("A payment may refer to the transfer of value other than money"). But in *Actavis*, support for this broadened reading of "payment" is thin. There is a concern about patent settlements in general, *see* Section I above, but there are only a few scattered indications that the Supreme Court intended its holding to apply to non-monetary "payments." As example, the Court wrote, "reverse payment settlements—*e.g.*, in which A, the plaintiff, *pays money* to defendant B." *Id.* at 2233 (emphasis added). There, the Supreme Court's use of "e.g." suggests that this scenario is nothing more than an example of a reverse payment settlement and there are

14

others. But that one Latin abbreviation is hardly enough to counter the overwhelming evidence that when the Supreme Court said "payment" it meant a payment of money.

The *Actavis* dissent critiques the majority precisely *because* it drew a line between monetary and non-monetary payments. Taking for granted that the majority uses the phrase "reverse-payment settlements" to refer only to money, Chief Justice Roberts argues that the Court's logic "cannot possibly be limited to reverse-payment agreements, or those that are 'large,'" suggesting that it must also sweep in "'other consideration' and 'alternative arrangements'" as well as even "the Court's own solution of negotiated early entry." *Id.* at 2245 (C.J. Roberts, dissenting). *See also id.* at 2243 (calling the distinction between money and other transfers of value "a distinction without a difference"). Chief Justice Roberts and Plaintiffs here agree: the scrutiny should be the same irrespective of what kind of consideration the settlement contains.

Plaintiff expends much effort trying to persuade this Court that the parties to the settlement each received something of value. *See, e.g.*, Pls.' Recon. Reply at 6-7 (ECF 122). Employing boldface type to express some combination of outrage, disbelief and condescension, Plaintiffs write, "the challenger (the alleged infringer) **is being paid by the patent holder** for something." *Id.* at 6 (emphasis original). As this Court wrote in its original dismissal opinion, "Without doubt Teva received consideration in the settlement. Otherwise, there would be no incentive to settle. A law student learns in the first semester that consideration is an essential element of any enforceable contract. In this sense, there is 'payment' in every settlement." Op. of Dismissal (ECF No. 105), *In re: Lamictal*, No. 12-cv-995 (WHW), 2012 WL 6725580, at *6

(Dec. 6, 2012). Plaintiffs have failed to explain how *Actavis* changes this; in fact, they concede that it has not. *See* Pls.' Recon. Reply at 4.

Moving on from the words of the opinion, Plaintiffs argue that applying *Actavis* scrutiny only to reverse payments of money "would be directly inconsistent with the overall holding and tenor of *Actavis*." Pls.' Mot. Recon. at 11 (ECF 113-1). Of course, an opinion's overall tenor is a less reliable measuring stick than its actual words. But the settlement is within the gestalt of *Actavis*. That Teva was allowed early entry, that there was no payment of money and that the duration of the No-AG Agreement was relatively brief all serve to persuade this Court that the settlement was reasonable and not of the sort that requires *Actavis* scrutiny.

Context matters. The facts before the *Actavis* court involved a payment by a brand name manufacturer of hundreds of millions of dollars to generic manufacturers, *id.* at 2229, as did the cases decided under the "quick look" and "scope of the patent" tests, *see* Teva Opp'n to Recon. at 9, n. 2 (ECF 119). It is good jurisprudence that the result flows from the factual source; this Court will not extend the holding of *Actavis* to the non-monetary facts before it.

### A.  *In re Lipitor* and *In re Nexium*

Other district courts have found that *Actavis* applies to non-monetary patent settlements. This Court finds their readings of *Actavis* unpersuasive.

Plaintiffs have found friendly language in a recent decision from this district, *In re Lipitor*. There, Judge Sheridan addressed a motion by Plaintiffs to amend their complaint in light of *Actavis*. 2013 WL 4780496, at *1. He allowed the amendments because "nothing in *Actavis* strictly requires that the payment be in the form of money." *Id.* at *26. As Defendants correctly point out, this is more like a request for further briefing than a decision. *See* Letter from Michael

16

Patunas, Sept. 19, 2013 (ECF 127). In fact, Judge Sheridan explicitly tabled that question. 2013 WL 4780496, at *26.

In re Nexium was, as here, a reconsideration in light of Actavis. 2011 WL 4832176, at *1. The facts and allegations in that case and this one are similar, with one crucial distinction: the plaintiffs alleged that the brand name manufacturer not only entered a no-AG agreement but also paid the first-filing generic millions of dollars. Id. at *6-9. So even though the Nexium court read Actavis to sweep in non-monetary payments—"[n]owhere in Actavis did the Supreme Court explicitly require some sort of monetary transaction," id. at *15—the allegation of cash payment made this statement dictum. In any event, it is unpersuasive to this Court.

The Nexium decision is distinguishable for another reason. The court interpreted the Actavis decision's call for scrutiny of "large and unjustified" reverse payments to sweep in "only those reverse payment agreements whose anticompetitive consequences are sufficiently great and sufficiently unrelated to the settlement of a particular patent dispute." Id. It found that Actavis scrutiny was appropriate because each of the three settlements was either "outsize" or "entirely disconnected" from the dispute over the Nexium patents. Id. Here, every element of the settlement is directly related to the dispute over the Lamictal patents.

In sum, the Lipitor and Nexium decisions reflect interpretations of Actavis which—to this Court's thinking—are unsupported by the words of Actavis or are inapposite. This Court does not find them persuasive.

### III.    The Rule of Reason Analysis

Because it is plausible that *Actavis* does not require finding a large, unjustified reverse payment of money, this Court has considered the settlement under the "five considerations" of *Actavis*. It finds that the settlement would most likely survive.

First, the Court believes that the settlement does not have the potential for genuine adverse effects on competition. The Supreme Court explained that "the likelihood of a reverse payment bringing about anticompetitive effects" is not presumed but "depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." *Actavis*, 133 S. Ct. at 2237. This Court finds that the potential for adverse effects on competition is minimal. That Teva was allowed six months of early entry, that there was no payment of money and that the duration of the No-AG Agreement was a relatively brief six months all serve to persuade this Court that the settlement was reasonable and not anti-competitive as forbidden by *Actavis*. While there may be instances in which a settlement without a monetary payment provision would raise antitrust concerns, this is not one.

Second, the payment is justified. Though the value to Teva of the No-AG Agreement likely exceeds what the parties would have spent litigating the patent dispute, the consideration which the parties exchanged in the settlement is reasonably related to the removal of the uncertainty created by the dispute. GSK may also have derived some ancillary benefit from Teva's licensed sales of lamotrigine in terms of distribution and marketing.

Third, the Court cannot conclude whether the brand name manufacturer has the market power needed to bring about anticompetitive harm, but finds that this would not be dispositive.

Fourth, the sweep of the settlement does not suggest that it is intended to maintain supracompetitive prices and serve as a "workable surrogate for a patent's weakness." Though the parties settled soon after Judge Bissell ruled that claim 1 of the '017 patent was invalid, the provision for early entry within the life of the patent and the relatively brief period of the No-AG Agreement persuade the Court that the settlement is not of undue size.

Fifth, the parties settled in a way that did not involve monetary reverse payments. *Actavis* provides an explicit carve out for parties to "settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration." 133 S. Ct. at 2237. Here, the settlement gave Teva the right to early generic entry along with a promise that it could do so without competition from an authorized generic for a limited time of six months. The Supreme Court made clear its intent to give patent litigants latitude to settle without triggering the antitrust scrutiny that large, unjustified reverse payments bring. GSK and Teva did just that.

It follows then that the settlement would survive *Actavis* scrutiny and is reasonable.

## CONCLUSION

The Court concludes that *Actavis* applies to patent settlements that contain an unjustified reverse payment of money. Such conclusion does not change this Court's earlier decision. The Court affirms its grant of Defendants' motion to dismiss.


Date: January 24, 2014

**<u>s/ William H. Walls</u>**
United States Senior District Judge
