UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: LAMICTAL INDIRECT PURCHASER AND ANTITRUST CONSUMER LITIGATION | OPINION |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Civ. No. 12-cv-00995 |

**Walls, Senior District Judge**

In this putative class action, Plaintiffs, purchasers of the drug lamotrigine, challenge the legality of a patent litigation settlement between the Defendant pharmaceutical companies. Plaintiffs now move to certify a direct purchaser class pursuant to Fed. R. Civ. P. 23. ECF No. 371. Decided without oral argument under Fed. R. Civ. P. 78, Plaintiffs' motion is granted.

### FACTUAL BACKGROUND

This matter has been litigated at length, and a full factual and procedural background is detailed in the Court's December 6, 2012 opinion. ECF No. 105. Directly relevant to this motion: Plaintiffs' theory of liability derives from Defendants' allegedly anticompetitive behavior and affects two subsets of direct purchaser plaintiffs who sustained damages therefrom. In sum, Plaintiffs allege that Defendant SmithKline Beecham Corporation (d/b/a GlaxoSmithKline) ("GSK") entered into a contract with Defendant Teva Pharmaceutical Industries Ltd. (and its subsidiary Teva Pharmaceuticals USA, Inc.) ("Teva") that caused antitrust injury. Specifically, during litigation between Defendants, Judge Bissell of this District ruled from the bench that Teva had shown that at least one claim relating to the patent for Lamictal—the brand name epilepsy and bipolar disorder drug marketed by GSK—was invalid, which strongly indicated that

Teva would be successful on the rest of its claims against the patent. Class Action Complaint ("CAC"), ECF No. 55 ¶ 56. Shortly thereafter, GSK and Teva reached a settlement agreement wherein GSK made two large concessions to Teva. First, Teva was permitted to sell generic lamotrigine chewables—separate and apart from Lamictal tablets and a much smaller relative share of the market[1]—three years before GSK's patent was set to expire. *Id.* ¶¶ 70-72. Second, GSK agreed not to launch an authorized generic ("AG") until six months after the expiration of the patent (the "no-AG agreement"), giving Teva a significant running start in the lamotrigine market share. *Id.* ¶¶ 76-77.

Plaintiffs claim two subsets of damages resulting to the direct purchaser putative class from Defendants' actions. First, brand purchasers were harmed because but for the settlement agreement, the Lamictal patent would have been invalidated and Teva would have been able to sell generic lamotrigine three years earlier, which would have allowed Lamictal purchasers to either buy Lamictal at a lower price (based on simple economics) or simply purchase the generic at a lower cost. *Id.* ¶¶ 112-114; 132. Second, generic purchasers were harmed because but for the settlement agreement, GSK would have not been bound by the no-AG agreement and would have produced their own generic six months earlier, which would have dropped prices in generic lamotrigine across the board. *Id.* ¶ 149. These in total are the alleged damages suffered by the direct purchaser class.

## LEGAL STANDARD

To obtain class action certification, plaintiffs must establish that all four prerequisites of Federal Rule of Civil Procedure 23(a) are met, as well as at least one part of Federal Rule of Civil Procedure 23(b). *Neal (Baby) by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir.1994). Rule 23(a)

---

[1] Both the tablets and chewables were covered by the same patent. *Id.*

requires a showing of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to all of the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182 (3d Cir.2001); Fed.R.Civ.P. 23(a)(1).

To satisfy the commonality requirement, Plaintiffs must show the existence of at least one question of law or fact common to the entire class. *See In re the Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 310 (3d Cir.1998). "All that is required is that the litigation involve some common questions and that plaintiffs allege harm under the same legal theory." *Baby Neal*, 43 F.3d at 58. *See also Hassine v. Jeffes*, 846 F.2d 169, 176–77 (3d Cir.1988) (holding that it is not necessary that all putative class members share identical claims).

The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work for the benefit of the entire class through the pursuit of their own goals. *See In re Prudential Ins. Co.*, 148 F.3d at 311; *see also Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 923 (3d Cir.1992).

Finally, Rule 23 also requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). But where the class includes members with divergent interests because the time of class membership is a factor, the representatives may not adequately represent the class. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 449 (3d Cir.1977); *Miller v. Hygrade Food Prods. Corp.*, 198 F.R.D. 638 (E.D.Pa.2001).

If the requirements of Rule 23(a) are satisfied, the court must also find that the class action is maintainable under one of the sections of Rule 23(b). Applicable here, certification under Rule 23(b)(3) is permitted when the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir.2008) (quoting Federal Rule of Civil Procedure 23(b)(3)). "The twin requirements of Rule 23(b)(3) are known as predominance and superiority." *Id.*

In moving for class certification, plaintiffs have the burden of proving by a preponderance of the evidence that all the requirements of Rule 23 are met. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Hydrogen Peroxide*, 552 F.3d at 307. The Supreme Court has emphasized that Rule 23 does not set forth a mere pleading standard; the plaintiff must in fact prove that the rule's requirements have been satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). In considering a motion for class certification, the court must conduct a rigorous analysis, which will frequently "entail some overlap with the merits of the plaintiff's underlying claims." *Id.* (quoting *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364). "A class certification decision requires a thorough examination of the factual and legal allegations." *Newton*, 259 F.3d at 166. "The proper task of the trial court is to consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (internal quotations omitted).

The Rule 23 "rigorous analysis may require a district court to address, at least in part, the merits of a plaintiff's underlying claim because class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 370 (3d Cir. 2015) (internal quotations omitted). But the court's authority to examine the merits of a case on a motion for class certification should not be overstated. While a district court may delve beyond the pleadings to determine whether the plaintiff has satisfied Rule 23's requirements, it may not inquire into the merits in order to determine whether the elements of each claim may be satisfied. *Sullivan v. D.B. Investments, Inc.*, 667 F.3d 273, 305 (3d Cir.2011). "A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims." *Id.* Consistent with this understanding, the Third Circuit has held that factual findings of the court on a Rule 23 motion are restricted to the question of whether a class may be certified and "do not bind the factfinder on the merits." *Hydrogen Peroxide*, 552 F.3d at 318. If the Court finds that the action warrants certification, its order must "define the class and the class claims, issues, or defenses...." Fed.R.Civ.P. 23(c)(1)(B).

## DISCUSSION

Plaintiffs seek to certify the following class:

> All persons or entities in the United States and its territories who purchased Lamictal Tablets directly from GSK, or who purchased a generic version of lamotrigine tablets directly from Teva, at any time during the Class Period from February 17, 2008 until January 22, 2009 (the "Class").[2]

---

[2] Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.

ECF No. 371-1 at ¶ 1. Their proposed order premises liability on common issues such as whether: "Defendants conspired to delay and suppress generic competition to Lamictal Tablets;" "the reverse payments suppressed generic competition to Lamictal Tablets by delaying the launch of Teva's generic and GSK's authorized generic Lamictal Tablets;" and "absent the reverse payments, Teva would have launched its generic version of Lamictal Tablets and GSK would have launched authorized generic Lamictal Tablets." *Id.* at ¶ 3(b), (e), (g). To certify the class, this Court must confirm that the requirements of Rule 23 are met.

### 1. Numerosity

To be certified, the class must be "so numerous that joinder of all members is impracticable." *In re Cmty. Bank of N. Virginia*, 622 F.3d 275, 291 (3d Cir. 2010), as amended (Oct. 20, 2010). "[G]enerally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001).

Plaintiffs and Defendants dispute how many members of the class there really are. Plaintiffs seek to certify a class of 65 direct purchasers, who they argue are dispersed geographically in a manner that makes joinder impracticable. Motion for Class Certification ("Mot. Br.") at 20-21. Defendants argue that before the Court are actually two separate subclasses masquerading as one. They contend that Plaintiffs' theory of liability means the 65 member putative class is really "32 brand purchasers pursuing a switching theory" combined with "33 generic-only purchasers." Opposition to Mot. ("Resp.") at 2-3; 27-28. But whether Plaintiffs' theory of liability corresponds to its damages model is a question saved for a predominance analysis, not numerosity. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34, 133 S. Ct. 1426, 1433, 185 L. Ed. 2d 515 (2013) (finding that because "respondents' model falls far

short of establishing that damages are capable of measurement on a classwide basis…[they] cannot show Rule 23(b)(3) predominance"). If the Court finds that predominance is not met at that stage, it can then entertain subclasses, which would respectively need to meet all of Rule 23's requirements, including numerosity. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3d Cir. 2012). Defendants finally argue that "the class is actually smaller than 65 companies due to mergers among members," resulting in a class of either fifty-three or forty-eight in total. Resp. at 28-29. As Plaintiffs point out, classes of either 65, 53, or 48 are all greater in number than 40, and the Third Circuit has recognized a general rule that at such number numerosity has been met. *See Stewart*, 275 F.3d at 226–27. Defendants have not given the Court any reason to deviate from this rule. Plaintiffs' proposed class is sufficiently numerous to meet the requirements of Rule 23(a)(1).

## 2. Commonality

Plaintiffs claim that their putative class members share at least one question of law or fact sufficient to meet Rule 23(a)(2). Plaintiffs are correct that commonality is "easily met." *Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331, 339 (D.N.J. 2018). Because "the commonality inquiry is subsumed into the predominance inquiry," *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015), the deeper underlying questions as to the prevalence of common issues as opposed to individual ones is better suited for predominance analysis. Plaintiffs' class has a sufficient common question—did Defendants commit an antitrust violation resulting in classwide injury— to meet the requirements of Rule 23(a)(2).

## 3. Typicality and Adequacy

The Named Plaintiffs' claims are typical of the class sufficient to meet 23(a)(3)'s "low threshold." *Newton*, 259 F.3d at 183. Likewise, Direct Purchasers' class counsel and Named

Plaintiffs are respectively experienced and free of potential conflicts. Mot. Br. at 25-26. Defendants do not contest either of these prongs in their briefing; Rule 23(a)(3) and (4) are met.

### 4. Predominance

Rule 23(b)(3)'s predominance requirement demands that "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem v. Windsor*, 521 U.S. 591, 624 (1997). "[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, 667 F.3d at 298. A plaintiff must "demonstrate that [each] element of [each legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311.

### i. Penetration Rate

Defendants make a number of arguments as to why Plaintiffs fail to meet predominance, particularly in ways that would violate the Rules Enabling Act. "The Rules Enabling Act grants the Supreme Court the power to create federal rules of practice and procedure with the restriction that these rules 'shall not abridge, enlarge, or modify any substantive right.'" *Knepper v. Rite Aid Corp.*, 675 F.3d 249, 264 (3d Cir. 2012) (quoting 28 U.S.C. § 2072(b)). "The Rules Enabling Act underscores the need for caution. As [the Supreme Court] said in *Amchem* [*Products, Inc. v. Windsor*, 521 U.S. 591 (1997)], no reading of [Rule 23] can ignore the Act's mandate that rules of procedure shall not abridge, enlarge or modify any substantive right." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (internal quotations omitted).

Defendants first contend that the penetration rate proposed by Plaintiffs' expert, Dr. Lamb, "does not fit Plaintiffs' theory of liability and uses the class-action mechanism to

artificially inflate damages" in contradiction of the Supreme Court's holding in *Comcast*. Resp. at 14. Under *Comcast*:

> [A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3). Calculations need not be exact…but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effect of the violation…And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so.

569 U.S. at 35 (internal quotations omitted).

Defendants argue that Plaintiffs' liability theory includes the notion that "some purchasers bought Lamictal, and if generic lamotrigine had been available earlier, they would have switched a portion of those purchases to the generic." Resp. at 15. This is referred to throughout the briefing as the "switching theory," which allegedly resulted in damages to those who could have—but were not able to—switch from brand name Lamictal to a generic alternative (also known as "brand-generic damages"). Defendants contend this theory is not in accord with Plaintiffs' damages model, which "calculate[s] a penetration rate based on the amount of lamotrigine that all direct purchasers bought, not just brand purchasers." *Id.* at 16. A generic penetration rate refers to the "[percentage] of all units that would have been purchased as a generic product." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 322 (E.D. Mich. 2001). Defendants argue Dr. Lamb's concession that purchases made by generic-only buyers "wouldn't give rise to any brand-generic damages" solidifies their contention that this mismatch is fatal to *Comcast*'s edict, and leads to a damages differential of over $480 million when trebling is considered. Resp. at 16-17.

The Court believes Defendants have the better argument, but not entirely and not enough to create serious certification issues. Dr. Lamb created a classwide damages model by combining the damages for brand-generic direct purchasers and generic-generic direct purchasers.[3] *See* Lamb Dep. at 232:13-233:6. The penetration rate for brand-generic damages, however, takes generic purchasers into account because it is defined by Dr. Lamb as "the total EUs of generic lamotrigine tablet divided by the total EUs of total lamotrigine tablets in each month after the actual generic entry date." Lamb Report at ¶ 106. There is no sound reason for the brand-generic damages model to use a penetration rate that considers generic-generic data (or, at least, no good reasoning put forward by Plaintiffs and Dr. Lamb). Dr. Lamb brushes this criticism off as conflating classwide damages with brand-generic and generic-generic damages, contending that his job was to determine classwide damages only. Lamb Reply at ¶ 82. This is not so. Dr. Lamb's report found "the amount of aggregate damages suffered by proposed Class members…under the No-Payment Settlement Scenario and the Litigation Success Scenario to be $1.09 billion and $1.62 billion, respectively." Lamb Report at ¶ 12(d). He gets those numbers by specifically adding the damages totals of the brand-generic damages and the generic-generic damages. From Dr. Lamb's own report:

Table 3
Damages by But-For Generic Entry Date

| Damages | October 6, 2007 | September 1, 2006 |
|---|---|---|
| Brand-Generic | $761,651,015 | $1,195,231,856 |
| Generic-Generic | $325,432,929 | $426,731,999 |
| Total | $1,087,083,944 | $1,621,963,855 |

Source: WAC data & transaction-level sales data.

---

[3] Discussed *infra*, "generic-generic" class members refer to direct purchasers of generic lamotrigine who, but for the alleged no-AG reverse payment, would have paid less due to more market competition.

*Id.* at ¶ 110 (Table 3).

While the Court finds that this methodological error is somewhat significant to establish a precise damages calculation, it does not believe it to rise to the level of defeating predominance or violating the Rules Enabling Act. First, Dr. Lamb and Plaintiffs have recognized this input discrepancy inflates damages by roughly 10-17%, and that it can be fixed rather easily. Reply Br. at 12-13. Second, brand-generic damages are not solely dependent on brand purchasers who would have otherwise switched to a generic, but also on the credible economic analysis that Lamictal prices themselves would have dropped if a generic had entered the market, and a generalized penetration rate is not a problem for that latter subset of brand-generic damages. *See* Cmpl. ¶¶ 112-114. Third, imperfect damages calculations are more often forgiven in the antitrust context. *See In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) (stating that "the Supreme Court has long taught that damage issues in antitrust cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other context") (internal quotations and brackets omitted). Fourth, the model is still sound on the whole in a way that accurately traces Plaintiffs' theory of liability to damages. The Supreme Court in *Comcast* dealt with four different alternative theories of liability that could lead to damages. 579 U.S. at 27. This is not the case when "the model assumed the validity of all four theories of antitrust impact" and "did not attribute damages to any one particular theory of anticompetitive impact." *Id.* at 36-37. This is also not a model that does not "even attempt to" "measure only those damages attributable to that theory." *Id.* at 35. Here, there is one theory of liability corresponding to one model of damages, with the model simply lacking in one respect. This is not an instance of "[n]o damages model, no predominance, no class certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*-MDL No. 1869, 725 F.3d 244, 253 (D.C. Cir. 2013).

That Plaintiffs will likely have to amend an otherwise sound model is not enough to override the benefits of the class device or cause any rights deprivation to Defendants. *See In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017) (finding the fact "that the experts dispute what the appropriate inputs should be does not undermine the approach or the reliability of [the] model"). *See also In re Nexium Antitrust Litig.*, 777 F.3d 9, 32 (1st Cir. 2015) (stating that "the [Rules Enabling] Act…imposes no requirement at the class certification stage beyond ensuring that a methodology can be developed that is capable of excluding uninjured members"); *Comcast*, 569 U.S. at 35 (finding that "[c]alculations need not be exact" in a predominance analysis). Dr. Lamb's Revised Expert Reply Report,[4] and indeed the reports of Defendants' experts, demonstrate that a model matching Plaintiffs' theory is more than feasible.

### ii.   Uninjured Brand Purchasers

Defendants next argue that Dr. Lamb's model "conceals that some brand purchasers did not switch to lamotrigine when it launched and thus suffered no injury." Resp. at 18. Dr. Lamb acknowledges that two brand purchasers—H.C. Pharmacy Central, Inc. and Professional Drug Co., Inc.—did not switch from Lamictal to a generic option after it became available. Lamb Dep. Tr. at 291:24-292:23. The Court agrees with Dr. Lamb's contention that the model with those brand purchasers is sound because "one can't assume…that purchase patterns in the actual world over a specific period of time tell us about what purchase patterns would have been in a but-for world where generic entry happened much earlier." *Id.* Likewise, both H.C. Pharmacy and Professional Drug allegedly paid inflated prices for Lamictal compared to the but for world when

---

[4] *See* ¶ 164 (Table 3).

12

generics entered the market. The Court finds no significant presence of uninjured brand purchasers.

### iii. *Injury to Generic Purchasers*

Defendants next argue that common issues cannot predominate over individualized ones because Plaintiffs rely on average prices that do not show injury to generic purchasers, or if so must be proved on an individualized basis. Resp. at 20. Specifically, Defendants argue on a premise in Plaintiffs' generic-generic theory, contending that Plaintiffs' but-for world, where GSK is not forbidden from pursuing an authorized generic, ignores the "Contracting Strategy," whereby GSK simply lowered the prices of the branded Lamictal as a "novel" alternative to authorizing a generic competitor to Teva's lamotrigine, which it was forbidden to do. *Id.*

This argument is one that, in Defendants' briefing, often goes far beyond the realm of predominance and well into the merits of Plaintiffs' claims. "[A] court should not address merits-related issues beyond what is necessary to determine preliminarily whether certain elements will necessitate individual or common proof." *Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 305 (3d Cir. 2016) (internal quotations omitted). The Court will not address the multi-leveled microeconomic analysis of what each Defendant would or would not have possibly done in the but-for world, and instead focuses on whether the presence of the Contracting Strategy raises individualized issues that defeat predominance. Defendants maintain that this is a predominance issue because the Contracting Strategy forced Teva to offer generic direct purchasers discounts that ranged from roughly 20% to 60%. Resp. at 21. Defendants claim that Dr. Lamb impermissibly averaged this discount, which ignores the fact that some individual direct purchasers may have received discounts that resulted in lower prices than they would have paid

in the but-for world, given that some studies show a second generic lowers prices by 7-14%, which is less than the discount many direct purchasers received. *Id.* at 22.

But "[t]he use of averages to develop the aggregate amount of damages does not suggest Plaintiffs will be unable to ensure recovery is only for injured parties." *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *10 (D. Mass. Oct. 16, 2017). Besides the fact that a class can be certified with *de minimis* uninjured parties, courts have rightly noted "that a person suffers a cognizable injury and is impacted by a price-fixing conspiracy at the moment he pays an antitrust overcharge, even if the anticompetitive conduct at issue also results in offsetting benefits." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 683 (N.D. Ga. 2016) (stating that "[b]ecause of the nature of price-fixing, offsetting benefits that consumers allegedly received may not be used to reduce any damages a defendant owes for its anticompetitive conduct. And such benefits—which at most would affect only the calculation of damages—do not wipe away the antitrust injury"); *see also In re Nexium*, 777 F.3d at 27 (injury established even if class member suffered no damage because injury later offset). Here, injury occurred to potential generic purchasers at the moment the price of generic lamotrigine was artificially inflated by the no-AG agreement, even if GSK's Contracting Strategy later on possibly eroded some or all of the inflated price.

Averages are also more of a problem when plaintiffs seek to certify a class of indirect purchasers, of which this class is not comprised. *See Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, No. CIV.A. 04-5898, 2010 WL 3855552, at *22 (E.D. Pa. Sept. 30, 2010) (expressing the relative difficulty of certifying an indirect purchaser class compared to a direct purchaser class in the pharmaceutical antitrust context); *see also In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 144 (E.D. Pa. 2011) (finding again in the

pharmaceutical antitrust context that an analysis using averages "provides a reliable method to provide a reasonable estimate of the damages based on relevant purchase data"). Likewise, the fact that some generic purchasers were injured more or less strongly than others is not only permitted,[5] but is a reason for why averages are appropriate in the damages calculation.

Plaintiffs have shown that issues common to the class predominate over individualizes ones. They have met that condition of Rule 23(b)(3).

### 5. Superiority

The second inquiry under Rule 23(b)(3) is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Superiority asks the Court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd sub nom. Amchem*, 521 U.S. 591. The superiority analysis "calls for an inquiry into judicial economy and places great weight on whether the individual members can bring their own claims." *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 (3d Cir. 2016), as amended (Sept. 29, 2016). Here, the Court finds that the class action device is superior to joinder since there are core issues common to the entire class that make joinder a relatively uneconomical option. Defendants argue that many of the Plaintiffs have "claims worth over $1 million," which suggests they would individually bring their own suits if need be. Resp. at 29-30. Yet Defendants have provided no "argument as to why $1 million should be the standard by

---

[5] "[R]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Neale*, 794 F.3d at 374-75 (quoting *Comcast*, 133 S.Ct. at 1437 (Ginsburg, J. & Breyer, J., dissenting)); *see also City of Sterling Heights Gen. Employees' Ret. Sys. v. Prudential Fin., Inc.*, No. CIV.A. 12-5275, 2015 WL 5097883, at *13 (D.N.J. Aug. 31, 2015) (finding that "denial of class certification solely on the basis of individual damages calculations would be an abuse of discretion") (internal quotations omitted).

which a claim is determined as being economically worthwhile or not." *In re Androgel Antitrust Litig.*, No. 1:09-CV-956-TWT, 2018 WL 3424612, at *3 (N.D. Ga. July 16, 2018). Given that Defendants recognize Plaintiffs are "a cluster of corporations" and "sizable companies," Resp Br. at 2; 27, the million-dollar threshold is even less impressive, especially since, to quote Judge Posner, "millionairehood is not what it used to be," *Nw. Nat. Ins. Co. v. Donovan*, 916 F.2d 372, 374 (7th Cir. 1990). Because a class action "will achieve economies of scale, conserve judicial resources, preserve public confidence in the integrity of the judicial system by avoiding the waste and delay of repetitive proceedings, and prevent inconsistent adjudications of similar claims," *Almonte v. Marina Ice Cream Corp.*, No. 1:16-CV-00660 (GBD), 2016 WL 7217258, at *3 (S.D.N.Y. Dec. 8, 2016), superiority is met and the class is certified.

## CONCLUSION

Plaintiffs' motion for class certification, ECF No. 371, is granted. An appropriate order follows.

DATE: 12 December 2018

William H. Walls
Senior United States District Court Judge